R.D., Appellant–Petitioner,

v.

REVIEW BOARD OF the INDIANA DEPARTMENT OF WORKFORCE DEVELOPMENT and IDWD Adjudication, Appellees–Respondents.

No. 93A02–1005–EX–559.

Court of Appeals of Indiana.

Dec. 16, 2010.

Rehearing Denied February 14, 2011.

Gregory A. Bullman, Andrews Harrell Mann Carmin & Parker, P.C., Bloomington, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Stephanie Rothenber, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

R.D. was laid off by his employer, losing his position as a machinist. Desiring to retrain by obtaining a degree in graphic arts, R.D. took advantage of the Trade Act of 1974 ("the Trade Act"), and applied to use Trade Adjustment Assistance funding established under the Trade Act to pay for retraining in a graphic arts program at the Art Institute of Indianapolis ("the Art Institute"). The Indiana Department of Workforce Development ("the Department") is responsible to administer the funding available to Indiana residents under the Trade Act and in that capacity, the Department denied R.D.'s request based on its cost. During the administrative appeal of the Department's denial, the Department's director presented evidence that R.D. could enroll in a program at Ivy Tech at a cost of approximately $11,700, compared to the Art Institute's cost of more than $56,000. The Administrative Law Judge ("the ALJ") hearing R.D.'s appeal found that the programs at issue were substantially similar and denied R.D.'s application to attend the Art Institute because of the cost difference. The Review Board affirmed the ALJ's denial of R.D.'s application.

R.D. appeals the Review Board's decision, arguing that the evidence established that the Ivy Tech program was not substantially similar to the Art Institute's program and was not suitable for his needs. Concluding that the Review Board erred when it denied R.D.'s application for training at the Art Institute, we reverse and remand for proceedings consistent with this opinion.

### Facts and Procedural History

R.D. worked at General Electric ("General Electric") in Bloomington as a machine operator until September 19, 2009, when his employment was terminated due to a reduction in workforce. At the time of his termination, R.D. was earning $24.95 per hour. Thereafter, R.D. applied to the Department for trade adjustment assistance and/or trade readjustment allowance job retraining benefits programs established by the Trade Act.[1]

Additional facts, as found by the ALJ, are as follows:

> The claimant sought training at the Art Institute of Indianapolis which was denied because it did not fall under the "reasonable" cost definition of approvable training. The claimant wanted a degree in Graphic Arts. Classes would begin on or about February 18, 2010 and the training would last until September 24, 2011. The cost for tuition, books, and supplies would be $56,106. There was also a program at Ivy Tech in Indianapolis ... for a degree in Fine Arts.

---

1. 19 U.S.C. § 2296.

This program would begin on March 8, 2010. The classes would take 2 years and the total cost would be approximately $11,799.80. For both schools, the claimant would receive mileage because he lives more than 50 miles from Indianapolis, which would add approximately $8,000 to the cost of education. The claimant believed that the training at the Art Institute would be better because it would train the claimant in graphic arts. The claimant also might be able to eliminate some classes after preparing a portfolio for the Art Institute. The department believed that the cost for the Art Institute was unreasonable given the documentation submitted by the claimant compared to the cost of Ivy Tech. The claimant believed the program at the Art Institute would better train him for the type of work he wanted to do.

Appellant's App. p. 70.

During an administrative hearing on March 2, 2010, R.D. testified that he could obtain a degree in graphic arts from the Art Institute in approximately eighteen months. The Art Institute program would train R.D. in both print and web design within that eighteen month time period.

R.D. submitted extraordinary, high-quality examples of his graphic arts work both to the Department and to the hearing officer at the administrative hearing as a part of his evidence. See Appellant's App. pp. 55–67. It is clear from this evidence that R.D. is a gifted, self-trained graphic artist. R.D. further testified that he has "done part-time work in the past in the graphics field," but he is unable to obtain a full time position without a degree. Tr. p. 8.

In support of that testimony, R.D. submitted a letter from a previous, part-time, graphic arts employer, indicating that if there was an opening at the company, "[R.D.] would be an extremely strong candidate for that position" if he held a degree from the Art Institute. Id. at 43. R.D. earned approximately $40,000 per year at General Electric working at his hourly rate of $24.95, and, according to R.D.'s report and self-investigation, a job at his part-time previous graphic arts employer would pay $20 to $35 per hour upon graduation. In addition, R.D. submitted the Art Institute's published placement rate of 78.3% through its placement services for students like R.D.

Finally, R.D. presented evidence establishing that the Ivy Tech program the Department had approved instead of the Art Institute's program would require two years to complete. Moreover, at Ivy Tech, the student must choose either print or web design, and cannot attend both programs at the same time. According to the uncontested evidence R.D. presented at the hearing, an Ivy Tech graduate could expect to be hired into only an entry-level, temporary job, which would pay approximately $9 per hour. R.D. also submitted uncontested evidence that Ivy Tech lacks relevant placement services, and it could not provide any placement statistics for the graduates of its graphic arts programming.

The Department's representative at the hearing, Randy Frey, did not dispute the evidence that R.D. submitted. Rather, Frey focused on the programs' costs and testified that R.D. "must go with the lowest cost provider." Id. at 18.

In affirming the initial determination denying R.D.'s request for training at the Art Institute, the ALJ determined that "training may not be approved at one provider when, all costs being considered, training substantially similar in quality, content and results can be obtained from another provider at a lower cost within a similar time frame." Id. at 71. R.D. appealed the ALJ's decision to the Review Board. On April 30, 2010, the Review

Board adopted the ALJ's decision and affirmed the denial of R.D.'s request to attend the Art Institute. R.D. now appeals.

### Discussion and Decision

■ We initially observe that the Indiana Unemployment Compensation Act states that "any decision of the review board shall be conclusive and binding as to all questions of fact." *McClain v. Review Bd. of the Ind. Dep't of Workforce Dev.,* 693 N.E.2d 1314, 1316 (Ind.1998); Ind. Code § 22–4–17–12(a). Moreover:

> When reviewing a decision by the Review Board, our task is to determine whether the decision is reasonable in light of its findings. Our review of the Review Board's findings is subject to a "substantial evidence" standard of review. In this analysis, we neither reweigh the evidence nor assess witness credibility, and we consider only the evidence most favorable to the Review Board's findings. Further, we will reverse the decision only if there is no substantial evidence to support the Review Board's findings.

*Quakenbush v. Review Bd. of Ind. Dep't of Workforce Dev.,* 891 N.E.2d 1051, 1054 (Ind.Ct.App.2008) (citation omitted). We review the Review Board's conclusions of law *de novo. Penny v. Review Bd. of Ind. Dep't of Workforce Dev.,* 852 N.E.2d 954, 957 (Ind.Ct.App.2006).

■ In 1962, Congress first attempted to provide relief for workers in the United States whose jobs had been eliminated due to "a liberalized international trade policy." *Anderson v. Review Bd. of Ind. Employment Sec. Div.,* 412 N.E.2d 819, 822 (Ind.Ct.App.1981). Thereafter, the Trade Act was established

> to provide trade readjustment allowance benefits to qualified workers who had

lost their jobs due to foreign competition. In order to qualify individuals must satisfy group and individual worker eligibility requirements. Under the Act, the Secretary of Labor certifies that a group of workers is engaged in employment adversely affected by imported products and eligible to apply for [trade readjustment allowance] benefits. Individual workers within the group must then meet certain standards to qualify to receive such benefits.

*Sanders v. Review Bd. of the Ind. Emp't. Sec. Div.,* 514 N.E.2d 654, 656 (Ind.Ct.App. 1987). The Trade Act sought to alleviate requirements in order to "provide more benefits to more workers." *Anderson,* 412 N.E.2d at 822. As a result, the Trade Readjustment Allowance benefits program was developed.[2] *Sanders,* 514 N.E.2d at 656. Additionally, under the Trade Act, the Trade Adjustment Assistance program was enacted to assist those who became unemployed as a result of increased imports to return to suitable employment. 20 C.F.R. § 617.2. The Trade Adjustment Assistance program provides tuition and some of the incidental costs to retrain workers who have been laid off as a result of international competition. 19 U.S.C. § 2296. While there is no specific monetary limit on the cost of individual training programs for which applicants may obtain approval, there are some limitations on total annual funding for trade adjustment assistance training. 19 U.S.C. § 2296(a)(2).

Under the Trade Act, an eligible worker's request for benefits will be approved where

> (A) there is no suitable employment . . . available for an adversely affected worker,

---

**2.** Trade Readjustment Allowances are income support to persons who have exhausted Unemployment Compensation and whose jobs were affected by foreign imports. United States Department of Labor Website available at http://workforcesecurity.doleta.gov/ unemploy/tra.asp (last visited on November 17, 2010).

(B) the worker would benefit from appropriate training,

(C) there is a reasonable expectation of employment following completion of such training,

(D) training ... is reasonably available ...,

(E) the worker is qualified to undertake and complete such training, and

(F) such training is suitable for the worker and available at a reasonable cost.

19 U.S.C. § 2296(a)(1).

Additionally, 20 C.F.R. section 617.22(f)(2), which governs trade adjustment assistance, provides that "[t]he maximum duration for any approvable training program is 104 weeks." Reviews of trade adjustment assistance determinations are "subject to review in the same manner and to the same extent as determinations and redeterminations under the applicable State law, and only in that manner and to that extent." 20 C.F.R. § 617.51(a). In other words, a denial of training benefits is reviewable in state court as if it had been a denial of conventional unemployment benefits. 19 U.S.C. § 2311(d) (1988).

In this case, R.D. applied for trade adjustment assistance, but the Department denied his initial request on January 15, 2010 in a letter explaining that R.D.'s request for training was denied under.

20 C.F.R. section 617.22(a)(6)(ii) [stating] "[a]vailable at a reasonable cost means that training may not be approved at one provider when, all costs being considered, training substantially similar in quality, content and results can be obtained from another provider at a lower total cost within a similar time frame."

Appellant's App. p. 1.

A more complete version of 20 C.F.R. section 617.22(a)(6)(ii) provides that

(ii) Available at a reasonable cost means that training may not be approved at one provider when, all costs being considered, training substantially similar in quality, content and results can be obtained from another provider at a lower total cost within a similar time frame. It also means that training may not be approved when the costs of the training are unreasonably high in comparison with the average cost of training other workers in similar occupations at other providers. This criterion also requires taking into consideration the funding of training costs from sources other than [Trade Adjustment Assistance] funds, and the least cost to [Trade Adjustment Assistance] funding providing suitable training opportunities to the worker. Greater emphasis will need to be given to these elements in determining the reasonable costs of training, particularly in view of the requirements in § 617.11(a)(2) and (3) that [Trade Readjustment Allowance] claimants be enrolled in and participate in training.

Subsection iii of the same CFR section provides further guidance in determining the "reasonable costs of training:"

(iii) For the purpose of determining reasonable costs of training, the following elements shall be considered:

(A) *Costs of a training program shall include tuition and related expenses (books, tools, and academic fees), travel or transportation expenses, and subsistence expenses;*

(B) In determining whether the costs of a particular training program are reasonable, first consideration must be given to the lowest cost training which is available within the commuting area. When training, substantially similar in quality, content and result, is offered at more than one

training provider, the lowest cost training shall be approved; and

(C) Training facilities outside the worker's normal commuting area that involves transportation or subsistence costs which add substantially to the total costs shall not be approved if other appropriate training is available.

20 C.F.R. § 617.22(a)(6)(iii) (emphasis added).

Finally, an earlier portion of the same C.F.R. section makes the job placement success rate of the program to be funded under the Act an important component of the approval process.

> *Training shall be approved ... if the State agency determines that [ ] [t]here is a reasonable expectation of employment following completion of such training.... This means that, for that worker, given the job market conditions expected to exist at the time of the completion of the training program, there is fairly and objectively considered, a reasonable expectation that the worker will find a job, using the skills and education acquired while in training, after completion of the training.*

20 C.F.R. § 617.22(a)(3) (emphasis added).

Turning to the facts and circumstances presented in this appeal, we note that the Review Board made its determination based on the comparative costs of the programs at issue. As a matter of law, under 20 C.F.R. section 617.22, this means that the Review Board had to first find that the Art Institute and Ivy Tech programs are "substantially similar in quality, content and results" before it could approve programming based solely on cost. Even when we review only the evidence most favorable to the Review Board's finding, there is no substantial evidence in the record supporting the Review Board's finding of substantial similarity.

First, the Art Institute's program requires nineteen months of training at a cost of $56,106. The program would train R.D. in both web and print design. As a graduate of the program, R.D. stated that he could obtain a full time job in the graphic arts field at a salary of approximately $69,000. Tr. p. 13. Furthermore, the undisputed evidence from the hearing shows that the Art Institute has a placement rate of 78.3% through its placement services.

By contrast, the two-year Ivy Tech program provides a degree in either print or web design, but not both. Therefore, four years might well be required to complete both degree programs at Ivy Tech, at a cost of $23,599.60, plus the attendant mileage and subsistence expenses covered by the Act.[3]

Second, R.D. testified that the most he could hope for with an Ivy Tech degree was an entry-level position earning $9 per hour, far less than the $24.95 per hour he was earning at General Electric. This disparity is inconsistent with the intent of the Trade Act.[4] In comparison, R.D.'s letter

---

**3.** R.D. testified that after the first year of the Ivy Tech program, the student is required to choose either the web or print program. If R.D. were to obtain both web and print degrees at Ivy Tech, it is unclear whether he would have to repeat the first year of the program. Even if it is possible for R.D. to complete both Ivy Tech programs in three years at a lesser cost than $23,599.60, we would still conclude that the programs are

not substantially similar in quality and content.

**4.** An income of $9 per hour would be well below the Trade Act's goal of 80% of the worker's previous salary. *See Allen v. Dep't of Workforce Servs.,* 112 P.3d 1238, 1243 (Utah Ct.App.2005) (citing 20 C.F.R. § 617.22(a)(1)(i)) ("The term 'suitable employment' means ... work of a substantially equal of higher skill level ... and wages ...

from a prospective and previous part-time employer indicated that, with an Art Institute degree, he would be a strong candidate for a position paying $20 to $35 per hour, a rate entirely consistent with the intent of the Trade Act.

Finally, one of the preconditions for approval of the training under the Act is that there must be "a reasonable expectation of employment following the completion of such training." 20 C.F.R. § 617.22(a)(3). As a graduate of the Art Institute program, R.D. would be employable and a productive member of society at least five months, and perhaps as much as seventeen months, sooner than if he would have to complete two degree programs at Ivy Tech. More rapid and productive re-employment must be part of any meaningful consideration of "reasonable" cost, especially since re-employment stops the accrual of "tuition and related expenses (books, tools, and academic fees), travel or transportation expenses, and subsistence expenses" covered by the Act. *See* 20 C.F.R. 617.22(a)(6)(iii). The undisputed, and only, placement evidence in the record leads any reasonable fact-finder to the conclusion that as a graduate of the Art Institute program, R.D. would likely obtain full-time employment. There is no evidence, let alone "no substantial evidence," in the record that would support the conclusion R.D. would have a reasonable expectation of employment as a graduate of Ivy Tech, because Ivy Tech has no relevant placement services and could not provide placement statistics for students graduating from its graphic or web design programs.

Within this context, it is also important to note that R.D.'s desire to become a graphic artist is not a "pipe dream." R.D. provided extraordinary, high-quality examples of his graphic arts work to the Department and at the administrative hearing as a part of his evidence. R.D. is clearly a gifted, self-trained graphic artist. *See* Appellant's App. pp. 55–67. R.D. testified that he has "done part-time work in the past in the graphics field," but he is unable to obtain a full time position without a degree.[5] Tr. p. 8.

We find the reasoning of the Idaho Supreme Court in *Creps v. Idaho Department of Labor,* 149 Idaho 634, 238 P.3d 1284 (2010), to be instructive in this regard. There, in an appeal of a denial under the Act like ours, the court looked for "fundamental similarities" between the programs at issue. In *Creps,* the competing programs led to the same M.B.A. degree. Here, the Art Institute and Ivy Tech programs at issue are simply not "substantially similar in quality, content and results," and certainly not fundamentally similar. Here also, the competing programs do not lead to the same degree; in fact, the undisputed evidence indicates that the Art Institute degree is at least twice the degree of that offered by Ivy

---

not less than 80 percent of the worker's average weekly wage.").

5. An explanatory comment in the Federal Register states:

The ... State administering agencies shall approve training for individual workers at the lowest reasonable cost which will lead to employment and will result in training opportunities for the largest number of adversely affected workers. This means that State administering agencies should avoid approving training for occupations that require an extraordinarily high skill level relative to the worker's current skill level and for which total costs of training[,] including transportation and subsistence, are excessively high.

59 Fed.Reg. 906, 924 (Jan. 6, 1994). As we noted above, R.D. has demonstrated that he has the ability and skills required to excel as a graphic artist, and only training at the Art Institute will enable him to meet his goal of becoming a fully employed and productive member of society.

Tech and requires less than one-half the time required at Ivy Tech for completion. In addition, R.D.'s undisputed evidence indicates that employers would hire him in the field of his retraining at a reasonable salary or hourly wage only if he obtained the Art Institute degree.

For all of these reasons, the Review Board erred as a matter of law when it concluded that the Art Institute and Ivy Tech programs at issue were substantially similar in quality and content, and subsequently denied R.D.'s application for funding to attend the Art Institute based on cost of the programs, comparing only the initial tuition and related expenses of the programs, rather than the total cost of the programs, including savings to be realized from obtaining a more marketable degree that would employ R.D. sooner.

After reviewing the evidence most favorable to the Review Board and the undisputed evidence in the record, we conclude there is no substantial evidence supporting the Review Board's denial of R.D.'s request for retraining at the Art Institute.[6]

R.D.'s request for training at the Art Institute satisfies the "reasonable cost" requirement of 20 C.F.R. section 617.22(a)(6), and is consistent with the purpose of the Trade Act.

Reversed and remanded for proceedings consistent with this opinion.

NAJAM, J., concurs.

BAKER, C.J., dissents with opinion.

BAKER, Chief Judge, dissenting.

I respectfully dissent and must part ways with the majority's determination that the Review Board erred in denying R.D.'s application for training at the Art Institute. As the majority observes, we will reverse the Board's decision only if there is no substantial evidence to support the findings. *Quakenbush v. Rev. Bd. of Ind. Dep't of Workforce Dev.*, 891 N.E.2d 1051, 1054 (Ind.Ct.App.2008). Moreover, because R.D. is appealing from a negative judgment, we will not reverse the Review Board's judgment unless it is contrary to law. *Frye v. Vigo Cnty.*, 769 N.E.2d 188, 192 (Ind.Ct.App.2002).

20 C.F.R. section 617.22(a)(3) of the Trade Adjustment Assistance Program provides, in part, that "[t]raining shall be approved ... if the State agency determines that [ ] [t]here is a reasonable expectation of employment following completion of such training...." However, the explanatory provision of this section states:

> The ... State administering agencies shall approve training for individual workers at the *lowest reasonable cost which will lead to employment and will result in training opportunities for the largest number of adversely affected workers.* This means that State administering agencies should avoid approving training for occupations that require an extraordinarily high skill level relative to the worker's current skill[s] level and for which total costs of training[,] including transportation and subsistence, are excessively high.

59 Fed.Reg. 906, 924 (Jan. 6, 1994) (emphasis added). Moreover, "available at a reasonable cost ... also means that training may not be approved when the costs of the training are unreasonably high in comparison with the average cost of training

---

**6.** In his dissent, Chief Judge Baker concludes that R.D. failed to demonstrate "that the Review Board's decision was unreasonable in denying his application for funding to attend the Art Institute." Op. at 1071. While reasonableness is a consideration, on appeal, the Board's findings are subject to a "substantial evidence" standard of review. *See Quakenbush*, 891 N.E.2d at 1054. We apply the "substantial evidence" standard of review to evaluate the Board's denial of R.D.'s request for training at the Art Institute.

other workers in similar occupations at other providers." 20 C.F.R. § 617.22(a)(6)(ii).

Indeed, the goal of the Trade Act is to provide "more benefits to more workers." *Anderson v. Rev. Bd.*, 412 N.E.2d 819, 822 (Ind.Ct.App.1981). And, as the Idaho Supreme Court observed in *Creps v. Idaho Department of Labor*, 149 Idaho 634, 238 P.3d 1284, 1288 (2010), state agencies should "allocate training dollars in a manner that the greatest number of workers will derive the greatest benefit for the lowest cost." Finally, 20 C.F.R. section 617.22(a)(6)(iii)(B) provides that the *"first* consideration must be given to the lowest cost training which is available within the commuting area" in determining whether the costs of a particular training program are reasonable. (Emphasis added).

I do not quarrel with the majority's observation that R.D. "is a gifted, self-trained graphic artist," as evidenced by the examples of R.D.'s work that were made a part of this record. Op. at 1065. Similarly, I do not question the Art Institute's ability to provide its students with an outstanding education at a cost of $64,106, or its post-graduation placement rate of 78.3%. However, while R.D.'s evidence showed that he could be trained in both web design and print design at the Art Institute, it is my view that the education costs associated with that course of study impedes the purpose of the Trade Adjustment Assistance program. Indeed, three individuals could obtain two-year degrees in graphic arts from Ivy Tech for less than $64,106.

R.D. acknowledged at the hearing that the time involved in receiving a degree from either school was essentially the same length. And even if R.D. would have to complete two Associate Degree programs at Ivy Tech to obtain the same education that he could earn at the Art Institute through one program, the cost of two complete programs at Ivy Tech would still be $24,506.40 less than the tuition associated with one program at the Art Institute. In light of this evidence, I do not believe that it was erroneous for the Department to have focused on the costs associated with the various programs, or for the Review Board to have made its determination based on the comparative costs of the two programs.

I also note that notwithstanding R.D.'s claims that the training at Ivy Tech was simply not "suitable" for him, 20 C.F.R. section 617.22(a)(6)(i) provides that "suitable training" means "that the training is appropriate for the worker given the worker's capabilities, background and experience." As the majority observes, R.D. was employed as a machine operator at General Electric at a salary of $24.95 per hour at the time of separation. R.D. testified at the hearing that he has trained himself as a graphic artist and has done "some part-time work in the past in the graphics field." Tr. p. 8. When examining the relevant considerations set forth in 20 C.F.R. section 617.22(a)(6)(i), I cannot conclude that the Review Board erred in determining that the less expensive training at Ivy Tech was not suitable for R.D. after comparing the costs of the two programs.

When considering the purposes of the Trade Act, namely, to provide workers with training at the lowest reasonable cost that will lead to employment and result in training opportunities for the largest number of adversely affected workers, I cannot agree that R.D. has successfully demonstrated that the Review Board's decision was unreasonable in denying his application for funding to attend the Art Institute. *See Quakenbush*, 891 N.E.2d at 1054 (observing that our task is to determine whether the Review Board's decision is reasonable in light of its findings). In short, R.D.'s request for training at the

Art Institute does not satisfy the "lowest cost" requirement of 20 C.F.R. section 617.22(a)(6). Thus, I would affirm the Review Board's decision.